Willie Mason Riddle and Ida Crumley Riddle v. Commissioner.
Riddle v. Commissioner
Docket No. 24930.
United States Tax Court
1952 Tax Ct. Memo LEXIS 138; 11 T.C.M. (CCH) 741; T.C.M. (RIA) 52225; July 11, 1952
E. P. Riley, Esq., for the petitioners. Newman A. Townsend, Jr., Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income tax of petitioners and additions to tax due to negligence as follows: Year
Deficiencies
5% Additions to tax
1944
$ 596.00
$ 29.80
1945
1,324.66
66.24
1946
1,097.61
54.87
1947
12,460.96
623.05
Totals
$15,479.23
$773.96
*139 The issues are: (1) Did the respondent properly determine petitioners' taxable net income for the years 1944 to 1947, inclusive? (2) Are the deficiencies for the years 1944 and 1945 barred by the statute of limitations? (3) Are the petitioners liable for additions to tax for negligence under the provisions of Section 293 (a) of the Internal Revenue Code? Findings of Fact Petitioners, Willie Mason Riddle and Ida Crumley Riddle, are husband and wife, and are residents of Greenville, South Carolina. For the calendar years 1944, 1945 and 1946, they filed joint income tax returns with the collector of internal revenue for the district of South Carolina. For the calendar year 1947, the husband filed an individual income tax return with the collector of internal revenue for the district of South Carolina, and his wife filed no return for that year. Petitioners were married on August 26, 1933, and have no children. At the time of their marriage both were employed by a textile mill at or near Greenville, South Carolina. Mr. Riddle began to work in textile mills in early manhood and followed that occupation until about 1935. At one time he operated a portable canteen *140 for the mill and on other occasions was employed in various departments of the plant. His wages ranged from $15 to $37 per week. After their marriage Mrs. Riddle continued to work in the mill until about 1942, when she obtained employment with Ivy-Keith Co., a department store in Greenville. As a textile worker her wages were approximately $25 to $30 per week. She worked for Ivy-Keith Co. from 1942 to 1946 and received the following compensation: Year
Compensation
1942
$352.40
1943
615.05
1944
658.13
1945
596.81
1946
492.75
About 1935 work in the textile mills fell off, and Mr. Riddle went into the poultry and egg business on a small scale. Using his automobile at first and an International truck later, he traveled through certain rural areas of South Carolina, North Carolina and Tennessee, and bought live chickens and eggs. He paid for his purchases in cash and upon return to Greenville sold part of the live chickens and eggs to restaurants and markets at wholesale and the remainder at retail to housewives by house-to-house sales. By 1941 or 1942 the size and scope of the poultry business had increased, and Mr. Riddle rented a vacant building to use for *141 storage purposes. However, the poultry business was never a large operation nor particularly profitable. For 1941 and earlier years petitioners filed no income tax returns, but they filed a delinquent joint return for 1942 [1] and separate returns for 1943. While no records of the poultry business were available at the trial, the 1942 joint return disclosed the following with respect to that operation: Gross receipts: Sales of poultry
$ 3,283.20
Sales of eggs
13,572.00
$16,855.20
Purchases (no inventories): Poultry
$ 2,554.98
Eggs
11,700.00
14,254.98
Gross profit on sales
$ 2,600.22
Expenses
1,632.29
Net profit
$ 967.93
In December 1940 petitioners bought a three-room house near Judson Mills, a textile plant. At the time they were living in rented rooms. The purchase price of the house was $1,025. They paid $150 of the purchase price in cash and executed a mortgage to cover the $875 balance. They obtained $125 of the $150 down payment through a loan from Franklin Savings & Loan Association. Payments were due under the mortgage at the rate of $8.75 per month and were so paid. Title to the house was taken *142 in Mrs. Riddle's name. Petitioners immediately moved into the house. It was located on a rectangular lot approximately 80 by 119 feet. The front of the lot was fairly level, but there was a sharp incline toward the back. They obtained dirt from Judson Mills and had the lot filled in to eliminate the incline. This dirt cost $1.00 per load. Before the fill was started, there were exposed pillars 7 feet high at the rear of the house. As a result of the fill, the pillars under the house had to be repaired and the back steps rebuilt. In addition, petitioners improved the plumbing in the house. No records were available at the trial to show the cost of either the plumbing or the fill. As of December 31, 1943, the petitioners owed a balance of $671.10 on the mortgage covering the house. As of the same date, the petitioners' equity in the house and improvements amounted to $650. Petitioners were living in the house on December 31, 1943, and had it furnished with the following: Couch, two chairs, combination radio and record player, lamps, coffee table, end tables, bedroom suite, cedar chest, two bedroom rockers, wool rug, draperies, blinds, wood kitchen cabinet, sixfoot electric refrigerator, *143 kerosene oil stove, table, and kitchen rug. The radio and record player was bought about 1933. The cost of these furnishings to petitioners was $600. At December 31, 1943, petitioners had $1,500 in cash. This cash, the equity in the house, the household furnishings, and the International truck used for the poultry business, were the only assets owned by them on that date. The cost of the truck was $225. On the same date they owed $133.30 to the Franklin Savings & Loan Association. About 1942 or 1943 Mr. Riddle began to buy and sell a few used automobiles as a side line to the poultry business. Some time during 1944 he abandoned the poultry business altogether, rented a lot upon which to store and display cars, and began to devote his time entirely to the automobile business. At first, he personally did all of the buying and selling for the business. Later, in 1946 and 1947, while he continued to do the buying, he employed two or more salesmen. About 1945 he purchased a lot at another location and transferred his business there. The purchase and grading of this lot cost $1,175. Between 1944 and 1947 the size and volume of the used car business increased substantially. On their *144 income tax returns for the years 1944 to 1947, inclusive, petitioners reported sales and purchases of cars as follows: Year
Purchases
Sales
1944
$ 21,341.00
$ 22,273.00
1945
39,683.00
38,274.90
1946
67,680.22
76,930.00
1947
245,568.75
263,262.60
Some time during the period 1944 to 1947 Mr. Riddle erected an office building on the used car lot at a cost of $1,057. In addition, he sank a well, installed an electric pump, and constructed a small building to house the pump. The cost of the well, pump, and pumphouse was $1,000. On January 20, 1947, Mr. Riddle began to operate an automobile auction in conjunction with the used car business. Sales were held twice a week in an auction barn located on the used car lot. The auction barn was a concrete block building about 60 feet long and 40 feet wide. Inside, it had a platform for the auctioneer and other officials of the sale and bleachers for spectators. The barn was built in 1946 at a cost of $3,000. The platform and bleachers in the barn cost an additional $250. Between 1944 and 1947 Mr. Riddle erected a heavy fence, which had two gates that locked, around the used car lot. Some part of the cost of *145 this fence was included in the cost of erecting the office building and auction barn. The cost of the fence, not so included, was $432. For 1946 and part of 1947 Mr. Riddle's brother, Homer, kept some records for the used car business. About 1947 Mrs. Riddle gave up her job at the department store and thereafter kept similar records. They consisted of a crude notebook for each year in which a list of cars, described by make and motor number, was entered, and for every car listed there was also entered in columnar form the following: Cost, from whom bought, sales price, and profit. There are numerous cars listed in the 1947 book for which the entry has been marked out. Cars listed in the book, and which were not sold prior to the end of a year, were reentered in the book for the ensuing year. Such entries in the 1947 book for the unsold cars listed in the 1946 book were not made promptly at January 1, 1947, but rather were made some time thereafter when sales were effected. There is no entry on either the 1946 or 1947 books which shows the cars on hand at the beginning of such years. The used car business was conducted almost entirely by cash. Cars were always purchased for cash *146 and likewise either sold for cash or the checks received were immediately converted to currency. Expenses were also paid by cash. Mr. Riddle always handled the cash and kept it on his person. No record was maintained which showed the amount of cash on hand at any time. Likewise, no record of expenses paid by cash was kept. The income tax returns filed by petitioners for the years 1944 to 1947, inclusive, were prepared by C. S. Bowen, a Greenville attorney. Bowen was not an auditor, and he prepared the returns upon the basis of oral information furnished to him by petitioners. On Mr. Riddle's 1947 income tax return the inventory of the used car business at December 31, 1947, was disclosed as $17,846. The same figure is disclosed as the inventory at January 1, 1948, on petitioners' 1948 return, as well as on a "Merchant's Stock Statement" as of January 1, 1948, filed in March, 1948 by Mr. Riddle with the State of South Carolina. Bowen obtained the amount of the inventory by running up on an adding machine certain figures which Mrs. Riddle read to him from records and papers which she and Mr. Riddle brought to his office at the time the 1947 return was prepared. Mr. Riddle was temporarily *147 absent while the inventory was computed, and upon returning he argued that there were cars listed that did not belong to him and that the inventory was too high. On December 31, 1947, the petitioners had on hand 15 automobiles owned by them which were acquired at a cost of $10,675. In addition to these automobiles, petitioners also had at December 31, 1947, 246 gallons of antifreeze, some oil and tires, and two bathtubs, the aggregate cost of which was not less than $722. At December 31, 1947, the cost of petitioners' inventory of automobiles, tires, antifreeze and other supplies was $11,397. Between 1944 and 1947 petitioners bought desks, file cabinets, a typewriter, chairs, heaters for the auction barn and office, an amplifier for the auction barn, and other miscellaneous equipment for the used car business. The desks cost $53, the amplifier $100, the typewriter $59, and the heater for the auction barn $57.50. The total cost of all petitioners' office furniture, fixtures and equipment was $364.50. Petitioners had two bank accounts, one at the First National Bank of Greenville and the other at the South Carolina National Bank in the same city. At December 31, 1947, the balances *148 in these accounts were as follows: S.C. National Bank
$9,335.82
First National Bank
133.30
$9,469.12
The account at South Carolina National Bank was in Mr. Riddle's name, and between July 15, 1947, and February 15, 1949, it had deposits, charges and withdrawals, and balances as follows: Charges or
1947
Withdrawals
Deposits
Balance
July 15
375.00
2,652.32
23
396.00
3,048.32
Aug. 9
864.50
3,912.82
21
681.50
4,594.32
Sept. 18
1,985.00
6,579.32
20
450.00
6,129.32
Oct. 1
15.00
6,114.32
20
1,842.00
7,956.32
Nov. 5
740.00
8,696.32
18
5.00
8,691.32
Dec. 12
644.50
9,335.82
1948
Jan. 15
1,000.00
8,335.82
Mar. 16
5,000.00
3,335.82
19
500.00
2,835.82
20
875.00
1,960.82
Apr. 24
1,875.00
85.82
1949
Jan. 26
50.00
35.82
Feb. 15
.79
35.03 This account was still in existence in 1951 with a small balance on deposit. The only canceled checks available at the trial were those which evidence the withdrawals of April 24, 1948, January 15, 1948, and March 16, 1948. These checks are payable to cash. One is unendorsed, one is endorsed by Mr. Riddle, and the third, for *149 $5,000, is endorsed by Mrs. Riddle. The balance in this account as of December 31, 1947, belonged to petitioners. From time to time during 1947 and 1948 James C. Allison requested Mr. Riddle by telegram to forward funds to him in Trenton, New Jersey. Allison lived in or near Greenville but traveled extensively through the northeastern states for the purpose of buying cars. Upon a number of occasions during these years Mr. Riddle wired funds to Allison. Some of the dates upon which Mr. Riddle received such telegrams, the amounts requested by Allison, and some of the amounts wired by Mr. Riddle to Allison were as follows: Allison to Riddle
Riddle to Allison
Date of
Amount
Amount
Telegram
Requested
Date
Wired
July 8, 1947
$3,000.00
July 9, 1947
$3,000.00
July 15, 1947
4,700.00
July 16, 1947
4,700.00
Oct. 8, 1947
1,500.00
Oct. 9, 1947
2,000.00
Dec. 10, 1947
2,000.00
Feb. 9, 1948
2,000.00
May 7, 1948
2,000.00
Between January 1, 1944, and December 31, 1947, petitioners acquired four lots on Whitehorse Road, Greenville, South Carolina, at a cost of $1,900, and two lots on Florida Avenue in the same city at a cost of $800. *150 These lots had not been sold or disposed of on December 31, 1947. On December 31, 1947, there was not less than $103 of undeposited cash in petitioners' possession. In addition, they owned several articles of jewelry which had been acquired since January 1, 1944, and which cost $280. In either 1945 or 1946 petitioners built a new house. This house was a one-story frame structure and contained five rooms. It was located on three lots for which Mr. Riddle paid $400 each. The total cost of the house, exclusive of the lots, was not less than $6,500. In 1947, petitioners sold the three-room house which they had acquired in 1940. The sale price was $3,250. They did not disclose this transaction upon their income tax returns. Petitioners furnished their new house in part with the same furnishings that they had used in the old house. They did buy, however, in either 1946 or 1947 a new radio victrola, a new electric stove, and an additional bedroom suite. The stove cost $350, the radio $230, and the bedroom furniture $229. At December 31, 1947, petitioners owed $600 on account of these purchases. The total cost of the household furnishings which they owned at the end of 1947 was not *151 less than $1,809. Except for the $600 indebtedness incurred in purchasing furniture, petitioners were free of debt on December 31, 1947. The accrued depreciation on the buildings and equipment used in the automobile business was $1,100.30. Mr. Riddle's father, L. J. Riddle, died in March, 1949. During his lifetime L. J. Riddle was a textile worker. He was ill for about two years before his death and was hospitalized on several occasions. When he died L. J. Riddle left no property or estate. Mr. Riddle and his brothers paid the funeral expenses. During the years 1944 to 1947, inclusive, petitioners' personal living expenses were approximately $2,500 per year. On May 4, 1948, Special Agent Leonard L. Walker and Deputy Collector Carl E. Johnson began an examination of petitioners' liability for the years 1944 to 1947, inclusive. At the start of their examination Walker and Johnson found that petitioners had some books and records covering the years 1946 and 1947 but had none covering the years 1944 and 1945. Concluding that the available records were inadequate to reflect clearly petitioners' income, Walker and Johnson employed the increase in net worth plus personal expenditures *152 method of determining taxable income as the basis for their examination. They obtained information about petitioners' financial condition at December 31, 1943, and at December 31, 1947, from Court House and bank records and from oral statements by petitioners. Walker and Johnson concluded their examination on May 11, 1948, and on this date petitioners executed the following affidavit: "UNITED STATES OF AMERICA
"Western District of South Carolina] ss. "Willie Mason Riddle and Ida Pearl Crumley Riddle, being first duly sworn, upon their oaths depose and say: "As of December 31, 1947, our combined net worth consisted of the following: "Bank deposits: "S.C. National Bank
$ 9,335.82
"1st National Bank
133.30
"Cash on hand (estimated)
103.00
"Inventory
17,846.00
"Auction barn - office bldg. &
fences
4,739.00
"4 unimproved lots on White
Horse Road
1,900.00
"4 unimproved lots on Florida
Ave.
800.00
"Well & pump, complete
1,000.00
"Home and two extra lots in
add. to above
7,700.00
"Jewelry, - rings, watch, etc.
280.00
"Lot - including grading, etc.
1,175.00
"Office and auction barn fixtures
364.50
"Household furniture
1,809.00
"Total Assets
$47,185.62
"Less: Accounts Payable
600.00
"Total net worth as of 12/31/47
$46,585.62
*153 "We have made the foregoing statement freely and voluntarily, in order that the truth may be known, without any threats, or rewards, or promises of rewards, having been made to us. We have been duly advised and fully understand that we have the right under the Constitution to decline to make any statement or answer any questions which may tend to incriminate us under the laws of the United States, and have been advised that anything we might say, or any evidence which we might submit, can be used against us in any proceeding which may hereafter be undertaken by the United States. "(signed) W. Mason Riddle "(signed) Ida C. Riddle "Subscribed and sworn to before me at 3:00 p.m., this 11th day of May, 1948, at Riddle's Auction Lot, White Horse Road, Greenville, S.C. "Leonard L. Walker ( signed) "Special Agent, Bureau of Int. Rev. "WITNESS: "Carl E. Johnson ( signed) Deputy Collector." On the same date, namely, May 11, 1948, Walker and Johnson advised petitioners that they owed additional taxes, and petitioners agreed to come to the office of the collector of internal revenue a day or so later and execute consents to immediate assessment and collection of the additional *154 amounts due. Before going to the collector's office, petitioners consulted their attorney, Benjamin A. Bolt of Greenville, about the matter and arranged for Bowen, the attorney who prepared their tax returns, to accompany them and verify the tax computations. On May 13, 1948, petitioners, Bowen and Johnson met together at the collector's office, and, after Bowen had checked Johnson's computations and found them correct, petitioners executed a Treasury Department Form 903, "Waiver of Restrictions Upon The Assessment And Collection Of A Deficiency", for each of the years 1944 to 1947, inclusive, in which they agreed to immediate assessment and collection of deficiencies and penalties as follows: Year
Income Tax
5% Penalty
Interest
1944
$ 596.00
$ 29.80
$116.22
1945
1,324.66
66.24
178.74
1946
1,097.57
54.87
82.36
1947
12,460.96
623.05
186.90 Walker was not present when the consents were signed. Walker and Johnson did not threaten or intimidate petitioners during the examination and did not coerce petitioners into executing the net worth affidavit and the consents to immediate assessment and collection of deficiencies. These documents were signed *155 by petitioners freely and voluntarily after they had been advised by Walker of their constitutional right against self incrimination. Shortly after May 13, 1948, petitioners, through their attorney, Robert A. Dobson of Greenville, contacted the collector of internal revenue in Columbia, South Carolina, and charged that coercive tactics had been employed by the investigating agents. Thereafter, on May 19, 1948, R. C. Pitts, Assistant Collector of Internal Revenue, John W. Brantley, Senior Special Agent in South Carolina, and S. W. Taylor, Chief Field Deputy, conducted a hearing in Greenville to investigate the charges. Petitioners were present at the hearing and were represented by Bolt and Dobson. During the hearing petitioners were questioned separately, and at its conclusion there was a general agreement that the deficiencies would not be assessed and collected under the waivers executed by petitioners and that the case would be referred back to the Greenville field office for further investigation. Subsequent to May 19, 1948, petitioners' case was first re-examined by Deputy Collector C. E. Clay and later by Revenue Agent Joe Morrison. During both reinvestigations petitioners *156 were represented by Dobson, and Clay and Morrison dealt directly with him. At the conclusion of their respective examinations, both Clay and Morrison recommended that the original findings of Walker and Johnson be adopted. Acting on behalf of petitioners, Dobson executed a waiver, Treasury Department Form 872, on November 16, 1948, which extended the statutory period for assessment of income taxes against petitioners for the taxable year ended December 31, 1945, to June 30, 1949. This waiver was executed on behalf of respondent on November 26, 1948. Dobson derived his authority to act for petitioners from a power of attorney which they signed on May 19, 1948. During the latter stages of Morrison's reinvestigation, Dobson and Bolt withdrew from the case. Later, they instituted a suit in the Greenville County Court against petitioners to settle a dispute arising out of their representation of petitioners in the income tax controversy. This suit was tried about January 3, 1950. At that trial both petitioners herein testified that the net worth statements prepared by Walker and Johnson in 1948 were accurate and correct. The notice of deficiencies for the years 1944 to 1947, inclusive, *157 was mailed to petitioners on June 17, 1949. In the statutory notice respondent determined petitioners' taxable income for the years 1944 to 1947, inclusive, by use of the increase in net worth plus personal expenditures method as follows: Determination of Increase in Net Worth
Assets
12/31/43
12/31/47
Cash
$ 500.00
$ 103.00
Bank Deposits
9,469.12
International truck
225.00
Household furniture
295.00
1,809.00
Equity in home
500.00
Inventory
17,846.00
Auction barn, office bldg.,
fences built in 1945
4,739.00
Four (4) lots - Whitehorse
Road
1,900.00
Two (2) lots - Florida Ave-
nue
800.00
Well and pump (1945)
1,000.00
Home and two (2) lots
7,700.00
Jewelry
280.00
One (1) lot and improve-
ments
1,175.00
Office and auction barn fix-
tures
364.50
Total assets
$1,520.00
$47,185.62
Liabilities
Mortgage payable (other
than home)
$ 133.30
Accounts payable
$ 600.00
Reserve for depreciation
Fixtures
100.35
Buildings
700.95
Well
300.00
Total liabilities
$ 133.30
$ 1,710.30
Net worth
$1,386.70
$45,475.32
Net worth - 12/31/47
$45,475.32
Net worth - 12/31/43
1,386.70
Increase during period
$44,088.62
*158 Allocation of Increase in Net Worth on Basis of Gross Sales per Returns Gross sales per returns: 1944
$ 22,273.00
1945
38,274.90
1946
76,930.00
1947
263,262.60
Total
$400,740.50
Allocation of net worth increase upon basis of gross sales: For 1944: $ 22,273.00/$400,740.50 X $44,088.62 is
$ 2,450.45
For 1945: $ 38,274.90/$400,740.50 X $44,088.62 is
$ 4,210.20
For 1946: $ 76,930.00/$400,740.50 X $44,088.62 is
$ 8,463.67
For 1947: $263,262.60/$400,740.50 X $44,088.62 is
$28,964.30
Total
$44,088.62
Determination of Correct Taxable Income
1944
1945
1946
1947
Increase in net worth during year
$2,450.45
$4,210.20
$ 8,463.67
$28,964.30
Plus: Living Expenses
2,500.00
2,500.00
2,500.00
2,500.00
Income Taxes Paid
37.33
243.80
36.87
2,221.06
Total
$4,987.78
$6,954.00
$11,000.54
$33,685.36
Less: 50% of $1,800 long-term capital gain
900.00
Taxable income per statutory notice
$4,987.78
$6,954.00
$11,000.54
$32,785.36
On their returns for the taxable years 1944 to 1947, inclusive, petitioners disclosed taxable income as follows: Taxable Income
Year
Per Return
1944
$2,226.53
1945
1,389.71
1946
7,326.13
1947
5,731.18
*159 Petitioners filed their 1944 and 1945 returns on March 20, 1945, and January 15, 1946, respectively. The gross income disclosed upon their 1944 return was $4,021.60. The deficiencies for the years 1944, 1945, 1946 and 1947 are due to negligence on the part of petitioners. Opinion RAUM, Judge: The petitioners challenge the respondent's determination of their taxable income for the years 1944 to 1947, inclusive. Because they had no records covering the years 1944 and 1945, and only fragmentary records for 1946 and 1947, the respondent determined their taxable income for these years by the increase in net worth plus personal expenditures method. Where a taxpayer keeps no books of account or where those which are kept are inadequate, respondent in expressly authorized by Section 41 of the Internal Revenue Code to make a determination of taxable income by any method which, in his opinion, clearly reflects such income. Where the circumstances warrant it, the method used by the respondent for determining taxable income has met with judicial approval. Kenney v. Commissioner, 111 Fed. (2d) 374 (C.A. 5); O'Dwyer v. Commissioner, 110 Fed. (2d) 925 *160 (C.A. 5); Frank M. Wiseley, 13 T.C. 253, 254; Manasse Karger, 38 B.T.A. 209, 214. Moreover, there is a presumption that his determination is correct, and the burden of proof to show otherwise is on the petitioners. Cf. Louis Halle, 7 T.C. 245, 250, affirmed, 175 Fed. (2d) 500 (C.A. 2), certiorari denied, 338 U.S. 949; Frank M. Wiseley, supra. The petitioners do not claim that the respondent's use of the increase in net worth plus personal expenditures method was not justified. They contend: (1) That the increase in net worth and personal living expenses were inaccurately determined; (2) that the increase in net worth was improperly allocated over the fouryear period involved; and (3) that the respondent's agents employed coercive tactics during their investigation which invalidates the deficiencies asserted thereafter in the statutory notice of deficiency. The evidence convinces us that coercive tactics were not used by the respondent's agents, and we have made a finding to this effect. The evidence submitted by petitioners in support of their first contention consisted largely of their own self-serving *161 testimony. Some of this testimony was vague and unsatisfactory. While the petitioners agree with many of the amounts used in the respondent's determination of net worth, they disagree with his determination as to others. The following table shows the items in dispute: Respondent's
Petitioners'
determination
contention
December 31, 1943
Cash
$ 500.00
$ 5,000
Equity in house &
improvements
500.00
2,000
Furniture
295.00
1,800
Jewelry
280
Mortgage payable
(other than home)
133.30
December 31, 1947
Office - used car lot
1,057.00
1,050
Household furniture
1,809.00
1,800
* Residence - building
6,500.00
5,100
Inventory
17,846.00
10,675
Cash - S.C. Nat'l
Bank
9,335.82
Office & auction barn
fixtures
364.50
170
Fencing - used car lot
432.00
Well and pump
1,000.00
425
Platform - auction
barn
250.00
Note payable - L. J.
Riddle
4,800
No useful purpose would be served by discussing in detail the evidence and arguments of the parties with respect to all of the items in dispute. Suffice to say that we have *162 carefully examined the evidence relating to each item to ascertain whether or not the petitioners have satisfied their burden of overcoming the presumption of the correctness of the respondent's determination. Our findings reflect the conclusio5 reached on each of the disputed items. The evidence produced by petitioners with respect to most of them is not convincing and does not prove that the respondent's determination was not correct. On some items, however, they have proved to our satisfaction that the respondent's determination should be revised. The following discussion deals with these items, as well as with several of the large items as to which the respondent's determination is approved. The respondent determined that the petitioners had cash in the amount of $500 on December 31, 1943, whereas they testified that their cash on that date amounted to $5,000. The respondent's figure, even though his agents received it from the petitioners, impresses us as being too low and the petitioners' figure too high. As of December 31, 1943, Mr. Riddle was engaged in the poultry and egg business and was buying and selling a few automobiles. Respondent's determination gives petitioners *163 no allowance for inventory of poultry or eggs, or automobiles, on hand on that date, and if they were not entitled to such an allowance they must have had on hand the cash with which they were conducting these activities as they paid cash and sold for cash the commodities in which they dealt. After examining the evidence pertaining to the poultry and egg and automobile [businesses] on or about December 31, 1943, we are convinced that petitioners had cash on hand on that date in the amount of $1,500, and we have made such a finding. The parties stipulated that the cost of the residence owned by petitioners on December 31, 1943, was $1,025 and that on that date, there was an indebtedness outstanding against this property of $671.10. Petitioners urge that they expended about $1,000 after purchasing the property to install new plumbing and to fill in the rear of the lot. While they produced no records to support this claimed expenditure, and the estimate made by them appears to be excessive, we are satisfied that their equity in the house and improvements was more than the $500 determined by respondent. We have found as a fact that their equity in the house and improvements was $650 *164 as of December 31, 1943. The respondent determined that the cost of the houshold furnishings of petitioners as of December 31, 1943, was $295. Mrs. Riddle estimated that the total cost was between $1,600 and $1,850, but was unable to produce documentary proof to show how much was paid for any particular item. Her estimate was approximately the same for the furnishings of the house owned on December 31, 1947, which contained two additional rooms. While we think her estimate was too high, an examination of the list of furnishings in the house as of December 31, 1943, set forth in our findings, indicates that respondent's determination of $295 was too low. We have found as a fact that the cost of the furnishings in the house as of December 31, 1943, was $600. The respondent determined that petitioners' inventory as of December 31, 1947, was $17,846. This was the amount of the closing inventory shown in petitioners' return for 1947, and the amount of the opening inventory shown in their return for 1948. The evidence convinces us that the returns overstated the amount of petitioners' inventory. The cost of the cars on hand and unsold by petitioners as of December 31, 1947, was $10,675. *165 In addition, they had on hand on that date quantities of antifreeze and tires, and two bathtubs, which cost $722. We have found as a fact that the amount of the inventory as of December 31, 1947, was $11,397. At the trial the petitioners testified that the balance of $9,335.82 in the account at the South Carolina National Bank at December 31, 1947, belonged to James C. Allison and W. R. Martin, and that Mr. Riddle had an arrangement with these two men under which he sold cars that they bought in northern states, deposited the proceeds of such sales in the account, and upon request withdrew and wired the funds to Martin and Allison after they returned north to acquire other cars. Mr. Riddle indicated that he received no profits from the arrangement and that from time to time he settled up with Allison and Martin by dividing the funds in the account. Petitioners introduced a number of telegrams and Western Union money order receipts which indicate that Mr. Riddle wired to Allison $11,200 during the latter half of 1947 and $2,000 in May 1948. They also introduced a partial transcript of the bank account, shown in our findings, but offered only three out of many canceled checks. The *166 three checks offered were all drawn to cash, one being endorsed by Mr. Riddle, one by Mrs. Riddle and the other unendorsed, and did not correspond to any of the telegrams or Western Union receipts with which Allison was connected. In the petition filed by petitioners in this proceeding they listed the $9,335.82 balance in the South Carolina National Bank account as one of their assets at December 31, 1947. They never represented to any of the respondent's agents, either personally or through a representative, that the bank account belonged to Allison and Martin. The account was in Mr. Riddle's name, and neither Allison nor Martin was produced as witnesses to corroborate petitioners' testimony that the money in the account at December 31, 1947, belonged to them. Although petitioners established that Mr. Riddle wired $13,200 to Allison, they did not prove that any part of the amount was withdrawn from this bank account. In 1947 they were engaged in a used car business involving purchases and sales of approximately $250,000, and if their contentions are to be believed, they were carrying on this business with only $103 in petty cash and $133.30 in the bank (their balance in the First *167 National Bank of Greenville). This would be a hazardous cash position for a business of this size. A careful consideration of their testimony and the documents introduced by them convinces us that, whatever the relationship between petitioners and Allison and Martin may have been, the balance in the South Carolina National Bank belonged to petitioners rather than to Allison and Martin. Petitioners urge that Mr. Riddle owed his father $4,800 at the close of 1947. His father was a textile worker, who died in 1949 after a two-year illness, leaving no estate. His children paid the funeral expenses. Mr. Riddle testified that he repaid the borrowed funds in 1948 and 1949, and that his father used the money to defray the expenses of his last illness. He admitted that no note was given for the loan, that no interest was paid, and that he had no records or documentary evidence to establish the existence of the debt. He could not remember any details about the debt, when the money was borrowed, how much was borrowed on any one occasion, or how many separate advances were included in the $4,800 total. The evidence does not convince us that Mr. Riddle owed his father $4,800 or any other amount *168 on December 31, 1947. The petitioners contend that the method used by the respondent in allocating the increase in their net worth over the years 1944 to 1947, inclusive, upon the basis of gross sales disclosed on their tax returns, is arbitrary, unsound, and does not correctly reflect income. The respondent allocated the increase in net worth among the several years in the same ratio that gross sales per return for a particular year bore to total gross sales per returns for the four-year period. Petitioners urge that this method is unsound because it assigns too great a proportion of the increase in net worth to the year 1947. We do not agree. The size and scope of their used car business increased progressively between 1944 and 1947. This was the principal source of their income. The gross sales shown on petitioners' returns reflect the upward trend of the used car business as accurately as any other information that is available, and we think it reasonable to assume that their net worth increased in the same ratio as their sales. The petitioners do not propose any method that would be more accurate than that used by the respondent. The use of this method was necessitated by their *169 failure to keep accurate records of their income, and they have only themselves to blame if the results are not as precise as might be obtainable by the use of some other method based upon accurate information from properly kept books. In the circumstances of this case, we cannot say that the method employed was erroneous. Petitioners contend that inasmuch as the notice of deficiency was mailed to them on June 17, 1949, more than three years after the filing of returns for the years 1944 and 1945, deficiencies for these years are barred by the statute of limitations. Petitioners' return for 1945 was filed on January 15, 1946, and the notice of deficiency was mailed on June 17, 1949. Section 276(b) of the Internal Revenue Code provides that where, before the expiration of the three-year period prescribed in Section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. Petitioners employed Robert A. Dobson, Jr. on November 16, 1948, as their representative to handle matters pertaining to their *170 1944 to 1947 returns and they executed a power of attorney which specifically authorized him "to execute consents agreeing to a later determination and assessment of taxes than is provided by the statute of limitations". In November 1948, prior to the expiration of the three-year period of limitation, a waiver was executed, by Dobson on behalf of petitioners and by an authorized representative of the respondent, extending the statutory period for assessment of any taxes due from the petitioners for the year 1945 to June 30, 1949. The notice of deficiency dated June 17, 1949, was mailed within the statutory period as extended, and the assessment and collection of any deficiency for the year 1945 is not barred by the statute of limitations. No consent was executed by the petitioners extending the three-year period of limitation for the assessment and collection of any taxes due from them for the year 1944. The respondent contends that under the provisions of Section 275(c) of the Internal Revenue Code the period for the assessment and collection of petitioners' 1944 taxes was five years because they omitted from gross income on their 1944 return an amount properly *171 includible therein which exceeds 25 per cent of the amount of gross income disclosed by the return. The amount of gross income disclosed by petitioners' 1944 return is $4,021.60, of which amount 25 per cent would be $1,005.40. We have made several adjustments in the items included by the respondent in the computation of petitioners' net worth as of December 31, 1943, and December 31, 1947, and it is possible that a computation of petitioners' gross income for 1944, when the revised net worth computation is made under Rule 50, will show that they did not omit from their 1944 return an amount of gross income in excess of 25 per cent. If it does, then Section 275(c) has no application and any deficiency for 1944 is barred by the three-year limitation period provided for in Section 275(a). If it does not, the five-year limitation period provided in Section 275(c) applies and the deficiency for 1944 may be assessed. The remaining question relates to the 5 per cent additions to tax for negligence determined by the respondent. Petitioners do not argue this question on brief. Since their taxable income was substantially understated for the years 1944 to 1947, inclusive, and they failed to *172 keep adequate books and records, the respondent's determination of 5 per cent additions to tax for negligence is sustained for the years 1945 to 1947, inclusive, and also for the year 1944, if the revised computation for that year shows that the petitioners omitted from their 1944 return an amount of gross income in excess of 25 per cent. Decision will be entered under Rule 50. Footnotes
1. Filed on February 14, 1945.↩
*. Parties are in agreement that lot on which residence was built and two extra lots cost petitioners $1,200.↩